## WILLIAM T. TURLEY V. STATE OF NEBRASKA.

### FILED OCTOBER 5, 1905.    No. 13,663.

1. **Jury: QUALIFICATIONS: WAIVER.** The objection that a juror is disqualified because of having been convicted of a felony may be waived. A party who does not inquire in regard to the matter on *voir dire* examination of the juror, nor object to the juror on that ground until after the trial, will be held to have waived the objection.

2. **Homicide: SELF-DEFENSE: EVIDENCE.** Upon trial of an information for murder, and a plea of self-defense, it is competent to show that the deceased was at the time in the lawful and peaceful possession of the premises where the homicide occurred; and for that purpose it is not error to allow, under proper instructions from the court, the introduction of evidence of a written lease conveying to the deceased the right of possession.

3. **Experts: EVIDENCE: REVIEW.** Matters of common observation and matters upon which jurymen are as capable of forming an opinion as are physicians and surgeons are not matters for expert medical testimony. But it is not necessarily reversible error to allow a witness to testify to a truism with which all intelligent men are presumed to be acquainted, nor is it in all cases reversible error to allow a witness, over objection, to testify to a proposition of law, or a fact of science or nature which is a matter of common knowledge.

4. **Instruction: SELF-DEFENSE.** It is not error to instruct the jury in a trial for murder that, "when competent evidence has been introduced tending to prove that the defendant acted in self-defense, it is incumbent upon the state to prove to you beyond a reasonable doubt that he did not so act."

5. ———: ———. One who is violently assaulted may use such means for self-protection from the assault as would appear to an ordinarily reasonable and prudent man similarly situated to be necessary under the circumstances. An instruction which tells the jury that, if under such circumstances he uses "sound reason" in determining what is necessary for self-protection, it is all that is required of him, is inaccurate, but is not erroneous, requiring a reversal of the judgment, if it is coupled with another instruction which tells the jury that there must be an acquittal if under such circumstances the defendant had reasonable ground to believe and did believe that there was a design to take his life or to do him great bodily harm.

6. ———: ———. In a trial for murder, with evidence of self-defense,

when it appears that the accused was a trespasser or was otherwise violating the law at the time of the homicide, and there is evidence tending to show that the killing was done in justifiable self-protection from a vicious and dangerous assault by the deceased, it is error to instruct the jury that, "when a man without fault, in the lawful pursuit of his duties, is attacked," he may defend himself against such attack. A trespasser may defend himself against an unlawful and dangerous assault. But the whole charge upon this subject must be construed together; and if in one instruction the jury without such qualifications are plainly told that "where, from the nature of the attack, there is reasonable ground to believe that there is a design to take his life or to do him great bodily harm, and the party attacked does so believe, then the shooting of the assailant under such circumstances will be excusable or justifiable," it is not reversible error to tell the jury in another instruction that the defendant will under such circumstances also be justifiable if he is himself without fault and in the lawful pursuit of his duties.

7. ———: ———. Although it appears that the deceased was at the time of the homicide guilty of a technical assault upon the accused, it would not be lawful to use more force than necessary for self-protection from that assault; and, if the jury should find that the accused was a trespasser at the time, it would be his duty to retire from his assailant, if by so doing he could avoid all danger from the assault. To kill the assailant under such circumstances would not be justifiable. A request to instruct that "the law does not require the defendant to flee from his assailant" was properly refused as misleading.

8. New Trial: NEWLY DISCOVERED EVIDENCE. It is not error to refuse a new trial on the ground of newly discovered evidence, if the proposed evidence might with reasonable diligence have been produced upon the trial or is cumulative.

ERROR to the district court for Hall county: JAMES N. PAUL, JUDGE. *Affirmed.*

*Hamer & Hamer, Harrison & Prince,* and *J. F. Walker,* for plaintiff in error.

*Norris Brown, Attorney General, William T. Thompson, R. R. Horth, W. H. Thompson* and *C. G. Ryan,* contra.

SEDGWICK, J.

In March, 1903, one Norman T. Bliss was shot and killed by the defendant in Hall county, Nebraska. The defend-

ant, who is plaintiff in error here, was prosecuted in the district court upon an information which charged him with murder in the first degree. He admits that he shot the deceased twice with a shotgun, and that this caused the death of the deceased. He alleges that what he did was done in self-defense. Upon trial of this issue he was found guilty of murder in the second degree, and was sentenced to a term in the penitentiary for 17 years.

1. There appears to be some complaint made in the voluminous brief filed that the allegations of the information are not sufficient to support the conviction, and we find that this objection was made upon the trial, and that the point is preserved in the record. It is difficult to determine from the brief upon what ground this objection rests, and upon examination of the information it appears to be in the usual form and to contain allegations of all the facts necessary to constitute the crime of which the defendant was convicted.

2. There is also a contention in the brief that the evidence is not sufficient to support the verdict. The defendant had leased the farm adjoining the premises occupied by the deceased, and the day before the shooting occurred had brought his family to the farm, which he had leased. It appears that the deceased did not reside upon the premises occupied by him, but on the morning of the homicide he, with his young son, took some cattle and other property there, and soon after their arrival discovered that some trespassing pigs were destroying corn which was piled in an inclosure near the house upon the premises. They drove these animals away some considerable distance through the stubble fields and corn-stalks, and, while doing so, chased them with pitchforks and killed two small pigs of about 25 pounds each. There was evidence from which the jury were plainly justifiable in finding that these animals belonged to one Barnhart, from whom the defendant had leased the place that he occupied, and that the defendant had, by authority of the owner, assumed the care of the animals, and that the premises were so situated that

the defendant, from the house where he was at the time, could see the deceased and his son chase the animals and apparently using violence against them, and that the defendant thereupon took his shotgun, which was loaded with two shells, and, together with two boys, one being his son, who accompanied him, left his house and went in the general direction of the deceased and his son, who were chasing the animals. The two parties were so near to each other that an altercation or conversation ensued, and thereupon the shooting occurred which resulted in the death of the deceased.

On the one hand, it is contended by the state, and there is evidence tending to support the contention, that it was the chasing and killing of these animals by the deceased which caused the defendant to leave his house; that his purpose was either to prevent further injury to the animals or to punish the deceased; that from the time he left the house he walkedly rapidly toward the deceased, and that the deceased, seeking to avoid contact with him, started for the house upon the premises which he occupied, and that the defendant changed his course from time to time, so as to intercept the deceased, and that finally, when they came in contact, the defendant asked the deceased whose pigs he was chasing, and was answered that they were Mr. Barnhart's pigs; that he then asked the deceased how many of them he had killed, and was told not to ask too many questions; that, when this altercation began, the defendant was in the field upon the premises occupied by and in the possession of the deceased, and the deceased was in the public highway adjoining these premises; that thereupon the deceased passed through the wire fence into his field, and ordered the defendant to get off from his premises, and then started toward his home, walking in a general direction away from the defendant; that the defendant thereupon followed the deceased for a few steps, and then, being a short distance, perhaps two rods, from the deceased, the defendant discharged his gun toward the deceased, striking him in the arm and back, and wounding him; that there-

upon the deceased turned toward the defendant, shouting, "Don't shoot! Don't shoot!" and the defendant immediately shot the deceased in the breast, killing him instantly. On the other hand, it is contended by the defendant that he and the two boys who accompanied him left his house with the purpose of hunting; that they could not see the deceased and his son from the house where they started, and knew nothing of their whereabouts until they had hunted for some time in the open fields; that the meeting between the deceased and the defendant was not sought by the defendant, but was accidental; and that, when they met, the defendant inquired of the deceased whose pigs those were that he was driving, and was answered by the deceased that he did not know; that he then inquired how many he had killed, whereupon the deceased, being greatly enraged, passed through the wire fence, and with violent and abusive language and threats, rushed upon the defendant with a fork, which the deceased held in his hands; that the defendant said to the deceased, "Stop! or I will have to shoot," and, the deceased not stopping, but continuing his assault, the defendant first shot him in the arm, and afterwards through the body, which caused his death; and that this shooting was necessary on the part of the defendant to defend himself against the assault of the deceased. There was a large volume of evidence taken; many witnesses were examined; other facts more or less material were shown. The issue thus presented was peculiarly one for the jury to pass upon, and we are entirely satisfied that their verdict should not be disturbed for want of evidence to support it.

3. After the trial was completed, it was discovered that one of the jurors had formerly been convicted of felony in the district court for Hall county, and had served a term in the penitentiary, pursuant to a sentence imposed upon that conviction. The sentence was on the 3d day of March, 1886, and was for the term of one year. The convict was allowed two months for good behavior, pursuant to the statute, and was discharged on the 5th

day of January, 1887. The evidence shows that in a fire which occurred at the penitentiary the records of his discharge were destroyed. There is a transcript of the record kept in the office of the governor, from which it appears that he was allowed two months for good behavior, and it also appears that no copy of the order for his discharge was preserved in the records in the governor's office. It is shown that the custom was in such cases to insert in the order for his discharge a provision declaring the convict to be restored to all his civil rights in all respects the same as though a pardon had been granted. No reason or precedent is shown in the briefs for declaring this man now to be deprived of his civil rights, and, even if we were constrained to so hold, we do not think that the objection to this juror would require a reversal of the judgment. Great latitude is allowed the defendant upon the *voir dire* examination to enable him to ascertain whether there is any ground for objecting to the juror. He cannot waive an objection of this nature, and, after taking his chances of an acquittal before the jury selected, insist upon an objection which he should have raised upon the impaneling of the jury, and, if he makes no effort to ascertain whether a juror offered is qualified to sit, he must be held to have waived the objection. Any other rule would introduce uncertainty into a jury trial which would be intolerable.

4. The shooting occurred, as before stated, upon premises which were in the possession of the deceased. Objection was made to the introduction of a lease of these premises to the deceased. This lease was introduced only for the purpose of showing the deceased's right of possession, and the court in its instructions expressly so stated to the jury. It was of course competent to show that the deceased was in the peaceable possession of these premises, from which it was contended on the part of the state he had ordered the defendant at the time of the shooting. It may be that the introduction of this lease was unnecessary; that the other evidence sufficiently

showed the actual possession and control of the premises to be in the deceased. No apparent prejudice to the defendant resulted from its introduction; none is pointed out in the briefs, and we are not able to see that the defendant was prejudiced thereby.

5. It will be remembered that an important question that was disputed upon the trial was whether the deceased at the time of the shooting was making or threatening to make an assault upon the defendant, or was, on the other hand, seeking to avoid a conflict with him. It was shown by the position of the body that the deceased, when shot, did not fall toward the defendant, but in an opposite direction. Dr. George Roeder was called as a witness by the state, and qualified as an expert physician and surgeon. After testifying at large to an examination of the body and his qualifications as an expert, he was asked this question: "Doctor, assuming that a man received a charge of shot in the right chest, the charge you describe as entering the right chest of Mr. Bliss, when he was standing still, and being about twenty-five feet distant from the person who shot him, do you know in what direction he would fall?" and answered, "Yes, sir." He was then asked in what direction. Objection to this question was sustained, and it was not answered. The witness was then asked if he had had military service or special study as a military surgeon, and answered that he had, and then was asked this question: "Now, doctor, assuming that a man was charging forward at a rapid gait, and would receive a gunshot wound, like the one you have described as entering the right chest of Mr. Bliss, being some twenty-five feet distant from the person shooting him, do you know what direction he would fall?" and answered, "Yes, sir." He was then asked: "You may state in what direction he would fall." His answer was: "He would fall in the direction of the momentum of the body at the time of the shooting." A motion was made to strike out the answer, for the reason, among other things, that he bases his answer on common knowledge of facts

that are supposed to be understood by everybody, and not in the line of surgery. This motion was overruled and an exception taken. These rulings of the court are now assigned for error.

It seems clear that the objection to the question was well taken. Matters of common observation and matters upon which jurymen are as capable of forming opinions as medical men are not matters for expert testimony. 2 Elliott, Evidence, sec. 1,094. The answer which the witness made to this question shows that he did not regard it or answer it as a medical question, and it cannot be properly so regarded. The testimony therefore should have been excluded; but it is not pointed out in the brief in what manner the defendant could have been prejudiced by this answer. It had already been shown conclusively in the evidence, not only by this witness but by others, that from the nature of the wound the deceased would have no control whatever of his motions after receiving the wound. That being the case, we take it that the proposition that a human body, when suddenly deprived of all self-control, will fall in the direction of the momentum of the body is a truism with which all intelligent men must be presumed to be acquainted. This answer of the witness therefore could not be prejudicial to the defendant. When Dr. Smith was testifying, he was asked substantially the same question. It was objected, among other things, that "it is a matter to be determined by facts and physics, supposed to be familiar to everybody, and further that it would depend upon whether the force of the charge was sufficient to overcome the force presented by the body. * * * The body would keep on moving in the direction it was going by receiving a bullet or shot wound, for the momentum of the body is so much greater than the momentum of the shot, being 2,500 times heavier." The question was then modified as follows: "Then, you say the body would go on in the direction in which it was moving at the time the shot was received?" There was no objection to this question, and the witness answered:

"Yes, sir." Thus the defendant by his counsel stated as a matter of law the substance of the witness's answer. The witness was not allowed to state his belief as to whether the deceased was standing still or was advancing toward the defendant at the time of the shooting, but merely stated that which the defendant insisted was a matter within the common knowledge of all. The receiving of this evidence could not be prejudicial error, requiring a reversal of the judgment.

Some other objections were made to the ruling of the court in receiving and excluding evidence, but we do not find any errors in that regard. The witness Earl Bliss, a young son of the deceased, testified that at the time of the first shot the deceased was going away from the defendant, and it appeared that the second shot took effect directly in the breast of the deceased. This witness was asked: "Do you know of anything that made your father turn around toward Turley, so that he faced him?" And it is now urged that the court erred in refusing to allow this question to be answered. Also, the same witness was asked: "Now, then, if your father was only five feet west of Mr. Turley when he stood there in the road, and as he came through the fence, I want to know how he got to be two rods west of him?" The witness was not allowed to answer this question, and the ruling, it is contended, was erroneous. Both of these questions are in their nature argumentative, and, taken in connection with the questions that preceded them, were clearly so. Defendant's attorneys were allowed great latitude in the cross-examination of this witness, and the matters apparently aimed at in these questions were thoroughly investigated. It was clearly within the discretion of the trial court to exclude such questions. The other complaints upon the exclusion of evidence are of a similar nature and do not require further discussion.

6. It was claimed that the tracks made by the parties at the place of the shooting, as seen by witnesses immediately after the shooting, indicated that the deceased had

walked along the fence in the field for some distance, and
had been followed by the defendant immediately before
the shooting took place. It was sought to identify these
tracks as those made by the deceased and by the defend-
ant, respectively, and the witness, who had examined
them soon after the shooting and had described the boots
worn by the deceased at the time of the shooting, was
asked this question: "You may state how they compare
as to size, Mr. Booda, the tracks you saw along the fence
and the boots you saw on the dead man's body," and an-
swered: "I thought they compared all right, although I
never measured them." In *Russell v. State*, 62 Neb. 512,
and *Clough v. State*, 7 Neb. 320, it is said that to allow a
witness to tell the jury his belief as to who made certain
tracks was to invade the province of the jury, and it is
insisted that the ruling complained of comes within the
principle established in those cases. We do not so regard
it. The witness was not asked whether the boots of the
deceased made the tracks in question. He was asked to
state how they compared, and that only as to size. The
effect of this testimony was no different than if the wit-
ness had testified to the size of each, matters which were
within his knowledge, and not mere matters of opinion.
This objection we think was properly overruled.

7. Nearly all of the 31 instructions given by the court
upon its own motion are complained of. As to the most
of these instructions there seems to be no ground of com-
plaint whatever. They are, so far as we can see, clear and
satisfactory in their statement of the law to the jury.
Some of the objections, however, will be noticed. The
fourth and fifth instructions given by the court to the
jury are as follows: Instruction numbered 4: "You are
further instructed that a reasonable doubt is an actual,
substantial doubt arising from the evidence or want of
evidence in the case." Instruction numbered 5: "By the
term reasonable doubt, as herein used, is not meant a mere
caprice, conjecture or groundless possibility. It is an
actual, substantial doubt, based on a reason arising either

from the evidence or want of evidence in the case, and sufficient to cause an ordinarily prudent man to hesitate and refuse to act in the most important affairs and concerns of life. The guilt of an accused person is proved beyond a reasonable doubt when, upon the entire comparison and consideration of all the evidence, the minds of the jurors are in that condition that they can say from the evidence they have an abiding conviction to a moral certainty of the truth of the charge." It is possible that we do not understand counsel in the discussion of these instructions. *Cowan v. State,* 22 Neb. 519, and *Carr v. State,* 23 Neb. 749, which are cited, are not in point, as the instructions held erroneous in these cases defined a reasonable doubt as one having a reason for its basis derived from the testimony, and for the having of which the jury can give a reason. It was held that to require the jury to give a reason for the doubt, or else disregard it, was erroneous, and it was also held that the basis of doubt might be derived from a want of evidence as well as from the testimony actually given; but the instruction in this case is not subject to criticism on either ground. It is said in the brief that "a reason for the doubt is never necessary," and it seems to be insisted that it was error to instruct the jury that a reasonable doubt must be based on a reason arising either from the evidence or want of evidence in the case. We do not think that this proposition calls for a discussion, even in so important a case as this. There is not much difference between the expression "reasonable" and the expression "based on reason." We do not discover any prejudicial error in these two instructions.

8. In the next instruction the jury were told that, "when competent evidence has been introduced tending to prove that he did so act (in self-defense), it is incumbent upon the state to prove to you beyond a reasonable doubt that he did not so act, and if, upon a consideration of all the evidence in this case, you entertain a reasonable doubt as to whether the defendant acted in self-defense, it is your

34

duty to give the defendant the benefit of the doubt and acquit him." It is objected that this instruction requires the defendant to furnish some proof that he acted in self-defense. There are two sufficient answers to this objection. In the first place, the instruction does not require any proof from the defendant, but informs the jury that when competent evidence has been introduced upon that point, that is, when there is any competent evidence in the case tending to show that the defendant acted in self-defense, whether introduced by the defendant or by the state, the burden of proof is then upon the state. The second reason is that the defendant requested the court to give an instruction in the identical language now complained of.

9. The nineteenth instruction given by the court is as follows: "You are instructed that if you believe, from the evidence as explained in these instructions, that at the time the said defendant is alleged to have shot the said Norman T. Bliss the circumstances surrounding the defendant were such as in sound reason would justify or induce in his mind an honest belief that he was in danger of receiving from the said Norman T. Bliss great bodily harm, and that defendant did so believe, and that the defendant in doing what he then did was acting from the instinct of self-preservation, then he is not guilty, although there may in fact have been no real or actual danger." It is doubtful whether one who is the subject of a vicious assault is required in all cases to use sound reason in determining what he should do. If he acts as an ordinarily reasonable and prudent man would act under such circumstances, it is, perhaps, all that would be required of him. The language in this instruction, then, is not to be commended. This instruction follows one in which it is stated that "where, from the nature of the attack, there is reasonable ground to believe that there is a design to take his life or to do him great bodily harm, and the party attacked does so believe, then the shooting of the assailant under such circumstances will be excusable or jus-

tifiable." We cannot believe that the jury were misled upon consideration of these two instructions together. A number of instructions were requested by the defendant upon this point, but no request was made for an explanation as to what was meant by sound reason.

10. The objection made to instruction numbered 18, given by the court upon its own motion, is of a more serious character. That instruction is as follows: "You are instructed that in this case the defendant, William T. Turley, sets up the plea of necessary self-defense. The rule of law on this subject of self-defense is, where a man without fault, in the lawful pursuit of his duties, is attacked, and where, from the nature of the attack, there is reasonable ground to believe that there is a design to take his life or to do him great bodily harm, and the party attacked does so believe, then the shooting of the assailant under such circumstances will be excusable or justifiable, although it should afterwards appear that no injury was intended and no real danger existed." In this case the jury may well have found from the evidence that the defendant was not without fault. According to his own evidence he was engaged in hunting on the Sabbath day, and he was a trespasser upon the land occupied by the deceased. It was admitted by all parties that he was not "in the lawful pursuit of his duties." In *Hans v. State*, 72 Neb. 288, an instruction similar to this, but omitting the words "without fault," was held to be prejudicially erroneous. In that case there was evidence tending to show that the defendant was a trespasser at the time of the homicide, and was therefore acting unlawfully. The instruction there complained of was followed with a more particular instruction as to the right of self-defense, but this made that right depend upon the existence of a non-essential fact which was in dispute. In the case at bar circumstances in evidence were of such a character as to make the fault of this instruction still more apparent. The conclusion is unavoidable that the instruction was not applicable to the facts in the case. We think, however, that this error is not of

such a character as to require a reversal of the judgment. In the next instruction, which is copied in another paragraph of this opinion, the court states the law of self-defense and applies it to the facts in this case, and tells the jury plainly that, if certain facts exist, the defendant is not guilty. The propositions that the defendant was without fault, and was in the lawful pursuit of his duties at the time of the killing, are not included as necessary in order to require his acquittal on the ground of self-defense. This is a positive statement that they must acquit the defendant if the necessary elements exist which are recited in the instruction, although it should not appear that he was without fault or was in the lawful pursuit of his duties. The statement in the instruction complained of that the shooting of his assailant would be excusable if these unnecessary elements existed in connection with others which were necessary do not contradict the positive statements of the nineteenth instruction, and could not have misled the jury. It appears to us that these two instructions, taken together, although each of them contains language that is not to be commended, do, if properly construed, and as they must have been construed by the jury, contain a correct statement of the law as applied to this case. Instructions that were explicit, and more fully explained the law in view of the peculiar facts of this case, would have been proper, and no doubt would have been given, if requested.

11. The defendant requested the court to instruct the jury as follows: "You are instructed that if you find from the evidence that the deceased Norman T. Bliss assaulted defendant, Turley, with a pitchfork, then the law does not require that defendant Turley flee from his assailant, but he might stand his ground and meet force with force." If the abstract proposition of law embraced in this instruction is correct, still we do not think that the refusal to so instruct the jury in this case is reversible error. The jury might have thought from the evidence that the deceased was entirely justifiable in ordering the defendant from his premises, but that the conduct of the deceased in insisting

upon the defendant's leaving his premises was such as would amount to a technical assault, and yet this instruction would induce them to suppose that under such circumstances defendant was justifiable in killing the deceased, although he had no reasonable ground to believe that he was in danger of serious injury, and notwithstanding that the use he made of the deadly weapon in his hands was entirely unnecessary to save himself from injury. The instructon as it was offered was not applicable to the facts in the case as contended for by either party, and might have been very misleading to the jury.

12. Exception is taken to some of the language used by counsel for the state in the closing argument to the jury. Some of these expressions are copied in the record and are discussed at large in the briefs. The main objection taken seems to be not so much to any particular statement or form of expression used as to the general character of the argument. We cannot, of course, present the argument complained of here. It is sufficient to say that we do not find therein any serious violation of the rights of the defendant.

Another point urged in the brief and discussed quite at large is that the court erred in not granting a new trial on the ground of newly discovered evidence. There was a large mass of evidence produced upon this point on the hearing of the motion, and we do not feel justified in taking the time and space necessary for a statement and discussion of the question. The evidence supposed to be newly discovered was cumulative in its character and of doubtful importance.

Other questions suggested in the brief have been considered, but are not of such importance as to require further discussion.

We find no error in the record, and the judgment of the district court is

AFFIRMED.